May I proceed, Your Honor? Yes, you may. I am Mike Wallace. I represent Governor Bryant. I represent Secretary Hoseman, who is here today in this effort to reinstate the 2012 redistricting law. The new districting law, passed after this Court's stay order a month or so ago, reinstates by its terms the 2012 law just as soon as the District Court's opinion is vacated. This is not the Staley case, which involved a monument in Texas held to violate the First Amendment. Harris County moved the monument, put it in a warehouse, and said someday at some unknown time and place we intend to bring it out again. This Court said that was not a live controversy. We have a live controversy. As soon as the District Court's order is reversed, if it is reversed, these defendants have been ordered by the legislature to put the 2012 law back into effect as soon as it can be done. If that decision is reached this week, all the statutory deadlines in Mississippi law can be met. But even if it is not reached this week, if it is reached any time this year, the Senate that is elected and convenes in January can call for special elections under the 2012 law. We have a live controversy. There is nothing moot about this dispute. The principal dispute in this case is the jurisdiction of the District Court. And if jurisdiction exists, there are several substantive and procedural issues in the case. I will primarily address the substance of Section 2 of the Voting Rights Act, but I'm prepared to touch latches and remedy any other questions the Court may have. To determine the jurisdictional question, there is really no need to devote to Justice Scalia's book and look at all the canons of construction. All you have to do is read the complaint. Plaintiffs agree that if it's a constitutional challenge to a state legislature, a three-judge court is required. This is a constitutional challenge. Section 2 of the Voting Rights Act enforces the 15th Amendment, and it rests on proof of a violation of the 15th Amendment. Here, this complaint alleges unconstitutional conduct by the State of Mississippi. They were allowed to introduce evidence of unconstitutional conduct over our objection, and the District Court, in its opinion, found unconstitutional conduct by the State of Mississippi and then proceeded to additional issues and imposed remedy. That's a constitutional case. Every Section 2 case is a constitutional case, or else it exceeds the power of Congress to mandate under the enforcement provisions of the 15th Amendment. This is a constitutional case. Read the complaint. We're entitled to three judges. Should you believe it is a statutory case, as plaintiffs argue, then you look at the text of 2284. And as Judge Higginson remarked in the last argument, we are all supposed to be textualists now. The way textualism works is you look at the text of the statute and you understand how that language would have been understood in this case in 1976 by the members of Congress who approved it. No one's made this argument in the 30-plus years, this textual argument, since that time, correct, until now? That is because so few cases in the 30-plus years since Section 2 was adopted have involved only a purported statutory claim. It's going to be very hard, and we couldn't find one, where somebody did what these plaintiffs did and brought only a textual claim without a constitutional claim. And Page v. Bartel says when those are together, you need to have a three-judge court. That's the way it's been in every case. It is now changing, as you know, because there is a case here in Louisiana that seeks to undo congressional redistricting only on a Section 2 basis. So you've got a brand-new issue. Sotomayor, you make a tight, legal, textual argument, and there's very — as you point out, there isn't much law for us, so we'll probably get that one as best we can just because of limited time. In your principle and reply brief, Section 3 was the Section 2 argument. If you could jump to that, it would help me. Am I right that you're primarily saying that there's clear error in the district court's finding that the black majority, bare majority, was illusory and ineffectual? I didn't find a finding that it was illusory and pretextual, if that's the word. Not pretextual. I'm using the word you used speaking to Judge Reeves, that it was ineffectual. Ineffectual, thank you. I don't think he made such a finding. I think the judge mechanically applied the three texts of Jingles. He said — that's what he did. He said this is a run-of-the-mill Section 2 case, and I think I told him there is no such thing as a run-of-the-mill Section 2 case. I think he erred, as a matter of law, by ignoring the teaching of the Supreme Court in such cases as Roe and Johnson v. DeGrande that you cannot apply Jingles mechanically to a single-member district. That's what the Supreme Court has said, and I think that's what the Supreme Court has meant. What the Supreme Court said — our Woodville decision, Supreme Court's LULAC language — that it's conceivable that if a majority-minority were rendered ineffectual, there could be a Section 2 case. And as I understood your argument below, it was, but factually, they didn't prove depressed black political participation. That is certainly our factual argument, Your Honor. I would disagree in reading the district court opinion as having embraced our legal argument and gone on to the facts. I don't think that's what he did. Well, when he cites Teague in footnote 72, he's embracing almost verbatim your legal argument that the easy is you can have these two things proven, racial polarized voting, socioeconomic disparity, past discrimination, and you may conclude those things have caused the political participation disparities that you see. And this is you to him. You don't have to have proof of causation. You may infer that causation. And then he cites that law in footnote 72. And that is what — that is what the Senate committee — that is what the Senate committee brief says. I'm not sure that textualists ought to be in the business of establishing rules of evidence from legislative history, but that's the way it's been for 35 years. And he followed the law in so doing. He followed the law that he can infer. But your argument is he made a — don't let me put words in your mouth, but your primary argument is he clearly erred when he found — credited Dr. Palmer as having concluded the white vote turns out more than 10 percent than the black vote. He can infer it. He did infer it. I don't think he could infer it or should have inferred it on this evidence. And I will — I will proceed to address the evidence stating only that I find no case in this circuit or anywhere else where on these facts that inference has ever been made. But we will get — we will get to the evidence. I think the evidence in this case shows that the black voting-age majority was not a losery and that the black registered-voter majority was not a losery, because — Let me just stop you on that. Do we have record evidence as to what the black voter-registered majority was? There is — well, there is evidence in the record of this case from which you can infer it, but we do not keep those records in Mississippi. You cannot go to the courthouse and count voters. But we do know, based on the census, that the census says we have about a 51 percent black voting-age majority in this district nine years ago. We also have evidence from the census. Whatever you think of the turnout information, we have evidence from the census that says blacks vote at a higher rate in Mississippi — blacks register in Mississippi at a higher rate than whites do. So you have a black voting-age majority. You have evidence that blacks vote — register at a higher rate. So the registered-voter majority is likely to be even higher than 51 percent. Statewide, though, is it not? Statewide, you're talking about? Statewide. And what about in District 22? There is no direct evidence of registration in District 22, so the statewide evidence, which, of course, is what would have been available to the legislature when they were drawing these lines, shows that black register at a higher rate. Now, Your Honor, I'm not saying they couldn't come into court and find some evidence that District 22 is different from the statewide. The plaintiff's expert produced some figures he got from the Secretary of State that, as I understand it, involved an analysis of the precincts in District 22. What he analyzed, as I understand it, Your Honor, is the turnout in District 22. And I don't think — I think the undisputed evidence in this case is that if you rely on statewide data, which is the best data we have, you've got a black-registered-voter majority. There has — nobody's ever found one to be illusory. But it's exact words where I find with very high statistical certainty that black voter participation is less than white voter participation in 2003, 7, and 15. I think he meant that to be turnout and not registration. But would we have — that — he meant — your suggestion that he meant that is clear error, that the district court relied on it? Well, he couldn't have meant anything else because there wouldn't be any evidence to support a finding that registration was less than a majority. Absolutely no evidence. The only evidence they offered was turnout. The turnout evidence they added, they offered in 2003, 2007, the earlier elections, were in a different district. But he extends it to 2015. 2015 is the only election they have in this district, only one. And what the Ron Held case says is that you generally cannot base a Section 2 finding on one election. Now, you can — But he had multiple elections that he looked at in 2015. He looked at the secretary of states, the governors, and the agriculture, right? I think he had those statistics. And — I do not think they are directly relevant, if only marginally relevant, to what happens in a Senate district. In a Senate — But, no, that was all the same district. His conclusions about white political participation being 10 percent higher draw on those three. Your expert, Dr. Morrison, said he wasn't asked to look at those. And those don't contain the administrative error alleged to have occurred. So why isn't that pretty darn solid expert opinion supporting depressed Black voter turnout? How do we say that's clear error? I think the best way I can tell you, Your Honor, is that it is at least not the best evidence that could be provided. And on that, I rely on the Rodriguez case, which tells you what their expert should have done instead of looking at statewide elections, which are very different from legislative elections. Frankly, it's not the best evidence. That's not the standard. And so then when I'm reading — because in his opinion, he says — his opinion forms particularly during cross of your expert. And then in the — Dr. Morrison says, no one even asked me to critique Dr. Palmer's analysis. I understand. I think the best use of our expert is to show that there are, in fact, no barriers to Black participation in Mississippi. There are — what he showed is that Blacks are able to organize at all levels in all things. And I think the — I think the even-year turnout records that the Census Bureau has, which are not challenged, show that there are no barriers. What Section 2 is supposed to be attacking is barriers. And if there is clear error here, it is clear error in finding that the low turnout was the result of a barrier. There aren't any barriers. I'll talk a bit about last year. You've got about a minute and 20 left. And your friends in opposition say there's no way the state suffered undue prejudice because they had time to enact a remedial map on March 27th, and they did. We can argue about how long it takes the legislature to create a considered judgment. Anybody who's been through the United States Senate knows that it doesn't move quickly, and nobody would pretend that this is the legislature's judgment of what is best for the state of Mississippi. But it's clear that equity is a balance. He balanced prejudice versus excuse. There was no excuse. Prejudice doesn't have to be very high. The fact that we're standing here the week before the ballots go to Afghanistan tell you that he got the balance wrong, but he also got the facts wrong. He said that we could finish it, that we could finish the case before the qualifying period ended. We didn't do it. We argued very much about electoral, about the difficulties of administration. Those difficulties are going on right now. Counselor, I'm going to add five minutes because the Latches argument is important, and I asked you a lot of questions. So don't worry about your run. Thank you, Your Honor. I appreciate that. The latest Latches case, the Chestnut case, points out that the biggest area of prejudice is the prejudice to the voters. In that case, the congressional election is over a year away in 2020. There'll be another redistricting for 2022. The court found that's going to create confusion for voters at the congressional level. What's your best circuit or Supreme Court decision on Latches in the electoral scheduling VRA context? What's the best one? I don't think there is a Supreme Court decision. Just circuit. And I think White v. Daniel may be the only circuit court opinion that we could find, and I recognize there are factual distinctions. White is down to a month out from the general election. And it's so — I guess what I'm really wondering is what's the furthest out suit that has been enjoined? I couldn't find one more than eight months, and this is a suit filed 16 months before. It may have been filed 16 months before, but it wasn't finished 16 months before, and that is where the district court made his factual error. But the trial was still nine months before. The trial was nine months. The trial — but the factual error — the factual error was in saying we can get all  the district court couldn't even get the trial done and the judgment done before the qualifying deadline. But the focus on the Supreme Court in the Purcell line of authority is we've got election chaos and voter confusion. In other words, it's just futile. But here, the arguments haven't really been — I mean, commendably, Mississippi has moved mountains, and they've got this thing redistricted. So the arguments instead are, well, it rushed us in trial, and we've had difficulties on appeal. What's the best latches case that looks at litigation crunch? I can't give it to you. But it is the argument, which is fine. I'm just — I mean, and — and I'm not sure there is a best case on that issue. I think our real argument at this point is just the mechanics of getting this done. And we — as we stand here, we don't know whose names are going to be on the ballot. Remind us of the fast-approaching drop-dead deadlines. Excuse me? Remind us of the fast-approaching drop-dead deadlines for mailing of overseas ballots and all the rest. June 17, which is next Monday, I think, is when the ballots have to be printed, and I think they have to go in the mail by Friday. Those things — those things are next week, and we're on a very close track on that. Your Honor, the factual error that we could finish it in time, I think, has a great bearing on the standard of review. Even where you have abuse of discretion, that discretion has to be based on the right facts, and those facts didn't turn out to be the case. But I think the greatest prejudice — because the Secretary of State's office has moved mountains to get this done and to be ready to do whatever you tell us in the next few days — the greatest prejudice, I think, is on voters who don't know where their lines are, on candidates who begin — in Mississippi, we elect everybody from constable to governor in an odd-numbered year, and as soon as it's over, you start preparing for the next one. But that voter — that is already built into this case, isn't it? I mean, those voters don't know which of two — it's 2012 or the ream done. That — we've built that in, or the whole situation. That uncertainty is built into the case, but it is built into the case because of the error of the district court, which we are asking you to correct as best you can. Nobody expects you to be able to do miracles, but we expect you to tell a district judge that this shouldn't happen again, that this particular exercise of discretion on which he got the facts wrong does constitute reversible error. I understand, having grown up in Chancery Court, that every equity decision stands on its own facts, but I think the facts here are egregious, and the problem is, particularly with this relatively unprecedented Section 2 case, where years after the census, you do a rifle shot at a particular line you don't like, raises problems for chaos in the future. We think the way to stop the chaos is to say the district court got it wrong this time, abused his discretion, and to vacate the judgment altogether. Let us go back to what the legislature told us to do, and if plaintiffs still want to try the merits of their case before a properly convened three-judge court, they'll have an opportunity to do it. I thank the Court, and particularly for the extra time. I appreciate it. Thank you, counsel. Good morning, Your Honor, and may it please the Court. I'm Rob McDuff, representing the plaintiffs. Before I turn to the laches question, I did want to mention one correction to our brief that I noticed this morning, and it pertains to the turnout issue. Page 52 of our brief, in the first paragraph, there is a cite to the record on appeal at 384. That actually should be 753. That's Dr. Palmer's testimony that he examined approximately 50 precincts when he was conducting this analysis. So in contrast to the two precincts, they say he should have examined. Fundamentally on that question, when he said black voter is depressed by 10 percent, was he basing that on all three of those statewide elections in 2015? No, he was basing that only on Senate elections. On what? Only on Senate elections in 2003, 2007, 2011, 2015. Okay. So that was the average gap. Right. In all four Senate elections, which he found turnout differentials in all of them. He found them to be. But he was looking at multiple district-wide elections for 2015 alone, wasn't he? The agriculture commissioner. He did that for the black voting analysis. I see. Okay. He did not look at that for the turnout analysis. But the turnout analysis was based on all four elections. He found that 2003, 2007, and 2015 to be statistically significant. He found 2011 to be weakly significant. But the importance here is that the defendants have never pointed out how it made any difference in terms of him not analyzing those two precincts in Cleveland where people got the wrong ballots. Because clearly he could not count those votes because the votes weren't cast in Senate District 22 for purposes of his racial black voting analysis. He also could not count them for the turnout analysis because as anyone looking at the those people voted in Senate District 12, which was unopposed in the general election. The Democratic candidate was unopposed. So naturally there's going to be drop-off in the participation in that election. So he could not have counted those two precincts in any of his analysis. But the argument, and it isn't discussed by their expert, but it is an attorney argument they're making to us, is that the largely white students that go to Delta State University don't turn out. So the 10% differential would have been less because there would have been lower white turnout as well. But there's actually no analysis of that. There's no, right, there's no opinion. No analysis. Nobody looked at the returns to see what the turnout was, for example, for the governor's race, which they could have done. They presented absolutely no evidence. And Dr. Palmer testified that his conclusions in 2015 were based on the other 50 precincts in the district. And there's just nothing to suggest that even if, in fact, they did not identify which precinct Delta State is in. But was that argument made to the district court? Well, there was no evidence put on about it. It was made in the district court, I believe, at the conclusion of trial. Maybe after we put on our case. But there's absolutely no evidence that Judge Rees pointed out. He said there is no evidence to call into question Dr. Palmer's methodology or to cast out on his conclusions. As I read Mississippi, both at the conclusion of your case and then in closing argument, they said there is evidence about racial polarized voting. There is evidence about socioeconomic disparity. We don't deny the official past discrimination history. We are saying that there isn't lower black participation. Is that what you understand their argument to have been? Yes. Okay. And so if that's true, if a State designs a majority-minority district and the black vote does turn out, you would agree there couldn't be a Section 2 violation unless they packed it. I don't agree that there couldn't be a Section 2 violation. I think there still could be if there were equivalent levels of turnout, depending on the black voting patterns. But here, we clearly have differentials in turnout in Senate District 22. But there is, they heavily relied on the census data. Right. And what's your, the district court didn't credit it for three reasons. In your mind, what's the most defensible, i.e., one that isn't clear error? Well, I think they're all defensible, but the fact that it's statewide elections is the primary difference, because we're not looking at the district in question. The fact that the census data reports data for presidential and congressional election years, not for state office election years, and the fact that the census data is self-reporting. I guess I would think that several of those would apply to whites as much as blacks. If, in fact, self-reporting tends to inflate because people want to show they are participatory, presumably it would apply to both. And if, in fact, having Barack Obama on the ballot means that blacks turn out more, that makes it sound like it's a mobilization issue as opposed to a state-on-account-of-race dilution. Well, you have to take an intensely local appraisal of this particular district. And in every election that was ever examined for Senate District 22, 2003, 2007, 2011, 2015, for Senate candidates and for every African-American running for state office. So the simple answer is Dr. Palmer is an expert. He looked at it all, this ecological approach. He gave a number, 10 percent depressed. That's not clear error. Oh, sure. It's not clear error for the reasons stated by the district court. In the 2015 election in District 22, you had a long-time incumbent in that race, didn't you? That's correct. Was that taken into account? He was. No, it wasn't, because the African-American voters preferred a different candidate. They preferred a different candidate in 2003 when he was not an incumbent. They preferred a different candidate in 2012 when he had one term. And so on and so on. Wouldn't that depress the vote of the opposition to the incumbent candidate saying, you know, why go out and vote? This guy's, you know, he's been in there so long, he's going to win anyway. You know, I don't know if that—I don't think that would have depressed the turnout in and of itself. I think the turnout is depressed usually from socioeconomic disparities and historical discrimination. And the courts have held, of course, as you pointed out, that there is no showing of causation required in that context. Now, that's an issue that was reiterated today by opposing counsel, certainly one that was told to Judge Reeves. And therefore, I guess that's our playing field. But in a majority-minority district, has our court ever suggested that there actually might be a causation requirement on plaintiffs? No, I don't think so. I think the Court has suggested in repeated cases that there is none. Suggested in what? The Court has suggested in repeated cases that there is none. And I don't think the fact that it's a majority-minority district makes any difference in terms of the congressional judgment. Right. That if you show historical— Now, Woodville was the case built on — in LULAC that both of you accepted as Section 2 violations can occur in a majority-minority, right? Yes. And then Woodville is followed by a case called Salas. Right. And you're familiar with Salas? I am. And our court in Salas, to me, did put a gloss on that has never been urged to Judge Reeves here and was not urged here. But how do you distinguish Salas as not putting a causation requirement back on the protected class? Well, I think Salas, in effect, was overruled two years later in LULAC v. Clements in majority — I think it's one year later, 1993, in LULAC v. Clements in Bank Opinion, which said there's no causal connection as required. And recently in Veazey v. Abbott, the Court said the same thing. Okay. That's because there is — there is complicated language in Salas. But you're saying you think both of you didn't embrace it because it was overruled in two different en banc cases by us. Oh, right. I think it's — and I think it's completely wrong. It's completely contrary to the congressional language as well. But — but, you know, I think — I think the multiple en banc rulings by this Court make it clear that a causal connection is not required. And I want to get back to my earlier point, though, about — about turnout, and that is that — that in every election for a statewide office, in every election for Senate of minority voters. This is not an episodic situation. But it is true also in Mississippi. In — in almost every Senate and House majority and minority district, blacks do elect a black representative. Is that fair to say? As long as it's 55 percent or over. Okay. Each. That's understood. Fifty-five percent or over. Okay. That's right. So here, the essence of your case, even though you didn't bring it into intentional discrimination, one, is that the state knew there's this 10 percent depressed from past discrimination, so they create a district that's just barely over 50 percent, knowing that they won't turn out. That would be the intentional case, correct? If we raise an intentional case, that would be part of it. We don't need to. I know you don't need to. So then, instead, you move forward on an effects test. You acknowledge there was no proof, as he finished his oral argument, of impediments and suppression. So this is built on the critical fulcrum of black participation being depressed from past discrimination, socioeconomic disparity. No inference can be drawn. Am I right? It includes that. It is not built on it, because as this Court has said in both of the Clark versus Calhoun County cases, proof of the jingles factors is sufficient, and it's going to be very rare that you have a case where the totality of the circumstances compels a verdict for the defense, even when you have proof of the jingles factors. The third condition is the one that is contestable here, because we don't have much data to run by to say white block voting usually defeats even a black majority. We don't have. We have 2015. Yeah, 2015. That's right. Yeah. I never understood this from the record. How similar is the pre-2012 District 22 to the 2015 District 22? And we do have this in our brief. It isn't? The pre-2012 district, that is the 2002 district with 2010 census data, was 49.8% African American and voting age population. And what happened is the Senate took that district and they made various changes, as they had to do, but they included the Madison County area. They included the white areas from Bolivar County to keep it such that the district would just creep over 50% to 50.8, but they kept it at that level. And it's pretty clear from looking at the election returns that whether you're talking about 49.8 or 50.8, black voters are not going to be able to elect a candidate of choice. Now, again, it's not an intent case, so we don't have to prove that they were thinking about that. We don't have to prove they were thinking about turnout differentials, but their effort to label this as a majority black district by pushing it barely across the line does not in any way defeat our Section 2 case, particularly the evidence of racially polarized voting that exists in every Senate election and every statewide election involving a black candidate within Senate District 22 from 2003 through 2015. Now, I want to turn to latches, if I may. Well, before you do, the DOJ preclearance, it doesn't figure into the analysis at all. Neither of you have said it did. It doesn't. Now, now, Joseph Thomas testified that he believed that once the Section 2, once Section 5 of preclearance was granted, he had no other options. And that's why he never filed any sort of lawsuit. That's rebutted, if we're moving to latches, that is squarely rebutted by his own letter to the Department of Justice opposing preclearance where he mentioned Section 2. He may have mentioned Section 2, but he's not been ---- He knew about Section 2 in 2012. Oh, he knew about Section 2, but that doesn't mean he knew there was a cause. He's not a lawyer. It doesn't mean he knew there was a cause of action just because Section 5 of preclearance is granted. Most lawyers don't know that. Most lawyers, most voting rights lawyers know it. Most lawyers don't even know that. At any rate, that's not terribly relevant because of the law that says you're required to file when you know or should have known. But what is important here is the absence of prejudice on latches. The district court made a finding, in fact. There's been no showing that's clearly erroneous. There were, there were, the discussion that you heard from counsel opposite about how difficult this is for the voters and all of the disruption, there are only eight precincts being moved. There are five precincts from Bolivar County, some of which are in the City of Cleveland, that go to District 13 so that the City of Cleveland is reunited. That may even make things simpler for voters. You've got three precincts that are in Sunflower County that are not part of, that are now part of District 22. But what's your best latches case? In this context, in terms of you, as long as you file a suit so many months out, how do you look at the law? The, well we have, I think the Ninth Circuit case in Garza, and by the way, the Fourth Circuit case in White, you mentioned that the lawsuit was filed a month before the election. It was actually filed after the election. It was actually filed after the last scheduled election. That's the only situation I've seen where a court of appeals overruled, or any appellate court overruled a district court's finding on latches, because it is inherently an equitable, equitable decision based on the facts. The Supreme Court overruled the Ninth Circuit in Purcell. I'm sorry? The Supreme Court overruled the Ninth Circuit motions panel in Purcell. Right. So that's an appellate court overruling someone to say don't monkey with the election. Oh, right. But the timing there is within a month also? And that wasn't a latch — I don't, I don't know. I have looked at Purcell, but I haven't recently, so I don't remember the timing. But that was not a latches case. That was just an equitable case on which, which district should be used. And the State panel has already decided that the legislative remedial district should be — Is it true or false that — is it true that all the facts necessary to plaintiff's case were known in 2015? After the 2015 election, yes. That's true. But I don't think there's any prejudice from it at all. And I don't see — they were — somebody mentioned a — I think you mentioned a litigation crunch, Judge Higginson. There was no litigation crunch. This was a simple case involving one district that could be remedied by drawing two districts — Well, he's complaining about a legislative crunch, not a litigation crunch, but legislative, where lawmakers, under sort of this Damoclean sword, have to put together a slapdash plan as opposed to a fully considered plan they prefer. The — And there's litigation crunch, yes, but also legislative. There was no — everybody was able to put their evidence on when you say there was a litigation crunch. Everybody was put — able to put their evidence on. We finished the trial in shorter time than was set aside for it. But in terms of the legislative crunch, it was two districts. They redrew it by moving eight precincts. You can punch — you can get in a computer, and you can punch a button, put in some data, punch a button, and see how many options you have. You can generate plans in seconds. They obviously looked at this. They determined that they could remedy this problem by moving eight precincts. It was not an imposition. It was — if anything, it was a minor imposition, but it's the sort of thing that legislatures do all the time when they redistrict. Here, though, they didn't have to redraw 52 districts. They redrew two by moving eight precincts, and that's what makes the prejudice here so minimal in contrast to every other case that's been cited by the defendants. You look at the — at the Chestnut v. Merrill from Alabama. Four congressional districts out of — I believe it's seven in Alabama. How far in advance of the election? Oh, it was filed — I don't know. It was filed a year in advance. I mean, it was not — it was not filed close. But the prejudice is very different there, because there you had four congressional districts. You don't know what the ripple effect's going to be. And you've got four elections held under that plan. Same thing in Fouts v. Harris, which involved congressional districts in South Florida. No telling what the ripple effect was going to be. What about Veazey? I'm sorry? What about in Veazey? About Veazey. Veazey, right. We lifted the stay. In the voter ID case? Yes. Yes. I'm trying to remember. You're talking about the second panel decision? Yeah. There was — a stay was lifted there, but that's a very different case than exists here, because there, there was — as I recall, the panel had ruled on the merits. Well, I think that — The district court erred. — reeducating thousands of Texas voter poll booth personnel within, again, we're talking a month. It seems to me these cases do hover around judicial electoral chaos and confusion, but almost all of them are within a month of the general election. There's some outliers that push out towards seven or eight months. That's why I was asking the opposing counsel, what's his best case? I don't find any that apply latches to a suit that's filed more than a year. But here, I think, in terms of looking at the prejudice from latches, you have to look at the fact that we're only moving eight precincts. And in some sense, the Bolivar County contributes — it actually contributes to clarity by putting the city of Cleveland back together. I'm sorry. Forgive me. I want to take you back to the Thorney jurisdictional question. OK. And Thorney is a mild word for it, but your counsel in opposition says that Section 2 enforces, implements a sort of bound up in the Constitution, that this is a constitutional challenge, that every Section 2 case, in effect, is a constitutional challenge, that the is a constitutional analysis. And what's your take? Well, Section 2 — no Section 2 case brought by itself is a constitutional case, because in Section 2, you do not have to prove discriminatory intent. Now, the Thorne v. Jingles totality analysis, which is taken from the Senate report when Section 2 was passed, includes factors like history of discrimination. So that is relevant. But that does not turn it into a constitutional challenge. So as you read the statute, if you were bringing a Section 2 challenge only against a congressional map, that too could go to a single judge. Oh, yes. Yes, because — and that's what's so interesting about their position. They say congressional modify — I mean, they say that the constitutionality modifies only congressional redistricting challenge and not state legislative redistricting challenges. But there is nothing, nothing in the legislative history saying that there is to be a different standard. And you would think that if Congress had intended for there to be a different procedure in congressional elections — in congressional challenges as opposed to state legislative challenges, they would have done more than add the words, the apportionment to the second clause of Section 2284a. Do you agree there isn't much precedent that's helpful on this new textual argument? Because no courts — even though many, many courts have reviewed single-judge Section 2 rulings, they've just all missed it? Or was it presented somewhere, and therefore, we've got valuable comparative — It was — it was presented in Chestnut v. Merrill with respect to a congressional plan. It was — there were several state legislative redistricting cases brought under Section 2 where single judges sat on the cases, and no one — no one, not a lawyer, not a judge, nobody said there was a problem with that. In the rural West Tennessee case, you had a three-judge court which resolved the constitutional claim and then sent it back to a single judge to deal with the Section 2 claim. None of those judges thought it. It's because if you look at the statute and just read it, I think it's pretty — I think it's pretty obvious, none of them would say, yes, constitutionality modifies both clauses. Only when you get down to looking at determiners, you know, and really — a strict grammarian might come in and say the apportionment in the second clause is a determiner that somehow breaks the change. What about the Third Circuit Page decision focused on by the dissent in the State panel? The Page decision deals with a constitutional and Section 2 claim. And the Court there simply said that they both should be kept as — before the three-judge panel because they are intertwined, because it's all part of the same, quote, action, end quote. But what's very interesting is you look at the beginning of that decision. They quote with ellipses Section 2284a in a way that assumes that constitutionality modifies State legislative reapportionment. And, indeed, if they had — if they had agreed with the position of the defendants here, there would have been no need for them to engage in that discussion because a single judge would have had no authority over a State legislative redistricting case in the — in the first place. Thank you. Oh, I see I've got a minute. I'm sorry. The — I do want to go back briefly to the — to the turnout issue because the defendants repeatedly say we only have one election under the current district. That's because only one election has been conducted under the 2012 — the 2012 plan. But the prior elections do include a lot of the territory of the 2012 district, that is, the 2002 district. And so, at any rate, with respect to the election that exists, we have proven racially polarized voting and lower turnout, and we've proven it with respect to the three prior elections that were conducted under the predecessor plan, which is very similar to the 2012 plan. Thank you. May it please the Court, not — not surprisingly, my long-time friend, Mr. McDuff, knows his own evidence better than I do, and those statewide elections go to black voting and cohesion, and we haven't disputed the issue on black cohesion. The only election that goes to turnout is the 2015 election. We do dispute that's sufficient. And even though there was only one election under this district, what the Rodriguez case says is that if you only have one election, you're not out of court. You can still do the proof, but the proof you have to do is something called reconstituted election analysis, which, as I barely understand it, means you look at all of those new precincts and see what they looked like in the old districts and bring them in and predict what they would do in this district. This Court told them how to do their proof. They didn't do it. We didn't offer proof about Delta State. I asked the Court to take judicial notice of it, and we've cited all of the cases in Mississippi where courts, in fact, have taken judicial notice that college towns tend to have low turnout, and the Court is absolutely correct to perceive. We do not claim that would have changed the outcome of the election. But if the crucial fact in this case is that white turnout is above black turnout, that's going to be very much impacted when you take out the two worst-performing white districts, white precincts, and say they don't count. So you have only one election, you have very bad evidence on that election, and you haven't done what Rodriguez says. Bad evidence is the Mississippi State electoral error, which now Mississippi is saying tends to rebut the deletion. It's actually an error committed by plaintiff's counsel, Mr. Turnage, who was counsel to the election commission in Coahoma County when they ran that election. I don't think that one can be blamed on the Secretary of State or anybody in Jackson. Did your expert explore this at all? Absolutely not. No. We asked for judicial notice. I don't pretend we introduced evidence on this. You didn't cross-examine Dr. Pomeroy. We did not cross-examine. I don't think we did. I may be wrong, but I don't think we did. We simply asked for judicial notice of facts that federal judges in Mississippi have recognized for years. And then the district judge did criticize, gently, your expert for having incorrect data, the coding, both as to who won, who lost, and who was black and who was white. The district judge took judicial notice of all kinds of things that happened in Yazoo County. But you wouldn't dispute his ability to take judicial notice of who's the winner in Yazoo County. Absolutely, I wouldn't. And I think he should have taken judicial notice of what goes on in Bolivar County as well. Judge Davis, he did not address the question of the effect of having an incumbent in that race, which has a great effect. Nor did he address the fact that Senator Thomas had lost a black majority district before, when he was an incumbent. So there's all kinds of reasons why Senator Thomas might have lost this race against an incumbent in a different black majority district. That's true. I mean, black voters could be apathetic. A candidate could be a poor candidate. The incumbent could. But the bottom line is, you did tell, following the law, the district court, that they could presume it was because of past discrimination. They can, but did not have to. And as I understand the Salas case, which each side's presumably, for their own reasons, didn't talk about, the Salas case says that there still has to be a connection to discrimination. It says that, but that's the opposite of what you told Judge Reeves. So I'd be curious, what was the reason you didn't bring it up? We said you could presume it. We said you didn't have to. And we did bring up the constitutional question, which I'm about to bring up right now. Before you do that, why didn't you cite Salas that does put a direct linkage burden on the plaintiffs? Is it because we overruled it in our two-all bond? No, I don't think you overruled it. And I think probably the answer is that Salas has good language and bad language for both sides, which is why neither side brought it up. But it's still the law. It hasn't been overruled. And while it says you may make a connection, if you don't make a connection, you have huge constitutional problems. If this Court is going to say that there is no need to connect constitutional relief to a constitutional violation, then we're going to have to look very hard at the constitutionality of Section 2. Last thing I would say is this, because my time's almost up. There may not be clear error here, but there are many cases in the past where there have been unexplained results in a case. They've relied on the case of Clark v. Calhoun County. And that's a case where a district court made factual findings, but this Court said that the Court has not addressed those factual findings sufficiently. We've gone through a lot of things this morning that were, in fact, brought up at trial that the Court has not addressed. Given the weakness of this evidence, I think affirmance would be a mistake, and at the very least, it should be sent back so Judge Reeves could have a chance to do what Judge Senter was told to do in Clark v. Calhoun County. Because I was asking a lot of questions. This last point, you're saying even if not clear error, there are unexplained things. What's our best authority to vacate, remand, not finding clear error, but because unexplained things happen? I think that's the first decision in Clark v. Calhoun County, which 21F3rd is probably your best authority that I can come up with on that. I think further thought is needed, and there are further things I could say, but the time is up. Thank you, Counsel. I thank the Court. That concludes the cases for the day. We will be in recess.